IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELA K. SHEETS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:23-cv-3754-MAB |
| ) | |
| GREENVILLE UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Angela Sheets filed an Amended Complaint against Defendant Greenville University ("Greenville") for claims arising under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972 (Doc. 13). Presently before the Court is Greenville's Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6) (Docs. 22, 23). For the reasons set forth below, Greenville's Motion to Dismiss is GRANTED (Doc. 22).

## BACKGROUND

Plaintiff Angela Sheets is a female softball coach who obtained her bachelor's degree from Greenville in the spring of 2012 (Doc. 13 at p. 2).[1] After graduating from Greenville, Plaintiff worked as the head softball coach at Peoria Christian Junior High School and obtained her master's degree from Bradley University (*Id.* at pp. 2-3). Around May 2020, Plaintiff received a call from Greenville University's Athletic Director, Tom

---

[1] This matter is currently before the Court on a motion to dismiss and accordingly, the Court takes all well-pleaded factual allegations in Plaintiff's First Amended Complaint as true and draws all permissible inferences in Plaintiff's favor. *See, e.g., Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 512-13 (7th Cir. 2020).

Ackerman (hereinafter, "A.D. Ackerman") (*Id.* at p. 3). A.D. Ackerman informed Plaintiff that a softball coaching position was available at Greenville and asked her to apply (*Id.*). Plaintiff did just that and was subsequently hired as Greenville's head softball coach on June 6, 2020 (*Id.*).

Plaintiff's first season as Greenville's head softball coach was in 2021 (*Id.*). At that time, Plaintiff was provided with a graduate assistant named Becca Oldham to help her manage the team (*Id.*). Oldham had played on Greenville's softball team prior to graduating and was friends with many of the current players on the team (*Id.*). During the 2021 season, Oldham actively worked with her friends on the team to undermine Plaintiff and lodge false claims against her (*Id.* at p. 4). Ultimately, the softball team went 9-15 in the 2021 season (*Id.*).

After the 2021 season ended, Greenville sent out anonymous reviews to Oldham and the team's players to evaluate Plaintiff (*Id.*). Oldham and several of her friends on the team made false claims about Plaintiff in those reviews (*Id.*). Thereafter, A.D. Ackerman met with Plaintiff for her yearly review, at which time he described the reviews but did not provide Plaintiff with copies (*Id.*). A.D. Ackerman told Plaintiff that he was aware that several players who made false claims about her had struggled with their conduct in the past (*Id.* at p. 5). However, A.D. Ackerman did not want to remove the problematic players, and instead suggested Plaintiff draft team rules and expectations (*Id.*). Plaintiff followed A.D. Ackerman's advice and created team rules and expectations, which every player later agreed to (*Id.*).

Oldham left her assistant position on the softball team following the 2021 season and Ivan Estevez was hired on as a part-time assistant (*Id.* at p. 6). However, Estevez also worked a full-time job in addition to his assistant position. As a result, Estevez was often late to practice and/or unable to travel to away games, and Plaintiff was frequently left to coach the 23 to 19 player team on her own (*Id.*). This prompted Plaintiff to ask A.D. Ackerman to increase her coaching staff by adding a full-time assistant coach (*Id.*). A.D. Ackerman informed Plaintiff that she could only have a full-time assistant coach if there were over 30 players on the team's roster (*Id.*). Consequently, Plaintiff created a junior varsity program and was able to grow the softball team's roster to over 30 players for the 2023 season (*Id.*). However, A.D. Ackerman then backtracked and told Plaintiff that she could only look for a graduate assistant (*Id.* at p. 7). The team finished the 2022 season with a record of 22-21 and made it to the conference championship game (*Id.* at p. 8).

Meanwhile, Greenville's Athletic Department was in the process of planning a multimillion-dollar sports complex during the 2022 season (*Id.*). The planned complex did not have any female specific locker rooms or showers, even though several men's teams received their own spaces. Plaintiff consistently advocated for her female athletes in opposition to the proposed plan (*Id.* at p. 9).

Anonymous reviews were again solicited from the softball players to evaluate Plaintiff following the 2022 season (*Id.*). Of the 18 voluntary reviews that were submitted, nine of them raised false accusations against Plaintiff – including allegations that Plaintiff was physically and mentally abusive (*Id.*). Plaintiff met with A.D. Ackerman for her yearly review in May 2022 (*Id.*). A.D. Ackerman indicated that Plaintiff wasn't going to

want to read the reviews and that the situation was no longer in his hands as the human resources department was now involved (*Id.*).

Thereafter, Plaintiff contacted the human resources department to discuss the investigation after she had not received any updates (*Id.* at p. 10). Plaintiff learned that Greenville's Chief Diversity and Culture Coordinator and Title IX Coordinator, Katrina Liss, was conducting a Title IX investigation related to Plaintiff (*Id.*). Plaintiff spoke with Liss, who indicated that Plaintiff should not be worried about losing her job as a result of the investigation (*Id.*). On May 14, 2022, A.D. Ackerman told Plaintiff to continue her duties as head coach (*Id.*). Two days later, Plaintiff told Liss that she should contact her assistant, Estevez, and a softball alumni, Shelby Cash, as witnesses on her behalf (*Id.*). Liss indicated that she would interview the complaining players and then provide Plaintiff with an opportunity to respond (*Id.*). On May 26, 2022, Plaintiff asked A.D. Ackerman and Liss if they could hold a meeting to discuss the investigation and how to proceed for the upcoming season (*Id.* at p. 11). One day later, Liss informed Plaintiff that she was terminated (*Id.*). Liss did not disclose the specific reasons for Plaintiff's termination (*Id.* at p. 12).

Following her termination, Plaintiff discovered that none of her references had been contacted (*Id.*). Additionally, Estevez was hired to replace Plaintiff as Greenville's head softball coach and A.D. Ackerman immediately provided Estevez with two full-time assistant coaches (*Id.* at pp. 13-14). However, it appears Estevez was proceeding with just one assistant coach at some point thereafter (*Id.* at p. 14). Additionally, Plaintiff alleges that Greenville has a clear record of providing male head coaches with more

assistant coaches than are provided to female head coaches; and likewise, has a record of employing male head coaches for substantially longer periods of time (*Id.* at pp. 13-15).

Plaintiff filed her original Complaint with the Court on November 21, 2023 (Doc. 1). Thereafter, Plaintiff received a right to sue letter from the United States Equal Employment Opportunity Commission in February 2024 (Doc. 13-1). As a result, Plaintiff filed the operative, First Amended Complaint on March 21, 2024 (Doc. 13). Plaintiff's First Amended Complaint raises three claims, including: (Count I) a claim of retaliation for opposing Greenville's discriminatory assistant coach policy under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.*; (Count II) a claim that Greenville terminated her employment because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*; and (Count III) a claim of retaliation for opposing Greenville's discriminatory sports complex plans in violation of Title IX (*see Id.* at pp. 15-20).

In response, Greenville filed the instant motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docs. 22, 23). Plaintiff filed a response in opposition to Greenville's motion (Doc. 24), and Greenville filed a reply in support (Doc. 27). Since filing its reply brief, Greenville has filed several motions and notices of supplemental authority with the Court (*see* Docs. 28, 29, 32, 37).

## **LEGAL STANDARD FOR MOTIONS TO DISMISS**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir.

2014). In order to state a claim upon which relief can be granted, the plaintiff's pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta*, 761 F.3d at 736 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff's pleading must state a claim that is facially plausible, meaning that "the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the plaintiff does not need to provide "detailed factual allegations," the plaintiff must plead more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

In deciding whether the complaint sufficiently states a claim, the court takes well-pleaded allegations in the complaint as true and draw all permissible inferences in favor of the plaintiff. *See, e.g.*, *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 512-13 (7th Cir. 2020). Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

## DISCUSSION

### I. Elements of Plaintiff's Claims Under Title IX

"Both Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 permit plaintiffs to bring causes of action for retaliation." *Burton v.*

*Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing 42 U.S.C. § 2000e-3(a) (Title VII), and *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (Title IX)). Under Title IX, an individual may bring a retaliation claim if he or she is retaliated against for opposing discrimination against others. *Jackson*, 544 U.S. at 179-180. Specifically, to state a Title IX retaliation claim, Plaintiff will need to show that: (1) she engaged in protected activity under Title IX, (2) Greenville took a materially adverse action against her; and (3) there was a but-for causal connection between the two. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019); *Burton*, 851 F.3d at 695.

Establishing causation under Title IX requires pleading that the decisionmaker's adverse action was taken in retaliation for Plaintiff's protected activities. *See Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 596 (N.D. Ill. 2021) ("A primary consideration for causation at the motion to dismiss stage is whether the plaintiffs allege some "retaliatory motive" connecting the protected activity and adverse action."). Consequently, under Title IX, "[k]nowledge of the protected activity is necessary to show causation for a retaliation claim." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022). This is because "[a] supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place." *Id.* at 915-16.

However, one exception to the requirement that a decisionmaker have knowledge of the protected activities is known as a "cat's paw" theory of liability. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021). "This theory is invoked in employment discrimination contexts when a biased supervisor, or a biased subordinate, 'who lacks

decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Id.* at 574 (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). To prevail under a cat's paw theory of liability, the plaintiff has to show that the ultimate decisionmaker's decision was "decisively influenced by someone who *was* prejudiced." *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 865 (7th Cir. 2016). *See also Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011).

## II. Analysis of Counts I and III

Greenville argues that Counts I and III must be dismissed because, among other reasons,[2] Plaintiff has not sufficiently pleaded causation, an essential element of her retaliation claims (Doc. 23 at pp. 14-16).[3] More specifically, Greenville emphasizes that Plaintiff has not alleged that Liss (the decisionmaker who terminated Plaintiff), even knew of Plaintiff's protected activities (*Id.* at pp. 14-15). In response, Plaintiff contends that: (1) she pleaded facts supporting the reasonable inference that A.D. Ackerman held a discriminatory animus against her based upon her advocacy/protected activities, and (2) A.D. Ackerman decisively influenced Liss's decision to terminate her (Doc. 24-1 at pp.

---

[2] The parties also dispute whether Plaintiff's employment discrimination claim under Title VII preempts Plaintiff's Title IX retaliation claims. This debate largely comes down to whether Plaintiff's protected activities and accompanying Title IX claims were brought on behalf of her student athletes or on her own behalf in relation to her employment. *See Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833, 841 (N.D. Ill. 2021) ("Here, the theory behind Agbefe's Title IX retaliation claim is that the Board subjected her to retaliation for opposing sex-based discrimination against herself, not against her students.… In other words, the alleged retaliation against Agbefe was due to her opposition to a discriminatory employment practice;… And thus, under the preclusion principle set forth in *Waid*, Agbefe may not bring that claim under Title IX."). Here, the Court elects to refrain from ruling on this issue at this time because of the other fatal deficiencies identified in the First Amended Complaint that are discussed below.

[3] Greenville has also argued that Plaintiff has failed to plead protected activities under Title IX (Doc. 23 at pp. 12-14). For purposes of this Order, the Court will assume – without having actually determined – that the two activities Plaintiff pleads are protected activities under Title IX.

11-14). Finally, Greenville's reply brief avers that Plaintiff's cat's paw theory is neither applicable nor adequately alleged in the First Amended Complaint (Doc. 27).

Having extensively reviewed the First Amended Complaint, the Court finds Greenville's arguments compelling. For one, the First Amended Complaint alleges that Liss, not A.D. Ackerman, was responsible for conducting the investigation that ultimately led to Plaintiff's termination (Doc. 13 at p. 10). In fact, the First Amended Complaint makes it clear that Liss and A.D. Ackerman did not even work in the same department at Greenville – Liss worked as Greenville's Chief Diversity and Culture Coordinator and Title IX Coordinator while A.D. Ackerman worked as Greenville's Athletic Director (Doc. 13 at pp. 3 & 10).

Notably, while A.D. Ackerman and Liss's distinct positions and departments in no way forecloses a cat's paw theory of liability, the issue is that the First Amended Complaint does not plead anything which would connect the dots between A.D. Ackerman's unlawful animus and Liss's decision to terminate Plaintiff. Put another way, nothing in the First Amended Complaint alleges that A.D. Ackerman decisively influenced Liss's decision to terminate Plaintiff. To the contrary, Plaintiff concedes that A.D. Ackerman informed her that the situation "was out of his hands" and was being taken up by human resources. Furthermore, Plaintiff has not adequately alleged a way in which A.D. Ackerman impermissibly influenced or interfered in Liss's investigation. For one, Plaintiff has not alleged that A.D. Ackerman lied to Liss about Plaintiff or in some other way duped Liss into terminating Plaintiff in retaliation for Plaintiff's advocacy. In fact, the First Amended Complaint does not even allege that A.D. Ackerman was

responsible for soliciting the reviews that prompted Liss's investigation.[4] And even more significantly, Plaintiff does not allege that A.D. Ackerman in any way impacted the contents of the reviews themselves.

Instead, Plaintiff avers that A.D. Ackerman unduly influenced Liss's decision to terminate Plaintiff by failing to disclose that "he knew the allegations were false." (Doc. 24-1 at p. 14). Admittedly, "[i]n some situations, the influence [needed to support a cat's paw theory of liability] can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908, 917 (7th Cir. 2007). Here, however, the Court questions whether A.D. Ackerman's failure to disclose his own personal belief that the player reviews contained false allegations could be considered a failure to provide relevant information in light of the fact that Liss was conducting her own investigation

---

[4] Admittedly, Plaintiff has adequately alleged that these reviews were not solicited for male sports teams (Doc. 13 at pp. 4 & 9). Yet, without substantially more, the Court fails to see how voluntarily requesting female athletes to fill out anonymous reviews could demonstrate an attempt to retaliate against Plaintiff on the part of A.D. Ackerman, Liss, or Greenville generally. Perhaps the Court's analysis on this point would be different if Plaintiff had alleged that A.D. Ackerman coerced or in some other way influenced the softball players to write false reviews about Plaintiff.

Moreover, it is worth mentioning that the two allegedly protected activities Plaintiff undertook did not occur during or immediately after the 2021 season. Rather, Plaintiff began her advocacy by requesting additional coaching after Estevez was brought on as her assistant (Doc. 13 at p. 6) and Plaintiff pleaded the athletic department was in the process of planning a new sports complex during the 2022 season (*Id.* at p. 8). In other words, neither of the protected activities that allegedly led to Plaintiff being retaliated against occurred prior to the 2021 negative reviews. Therefore, as currently pleaded, the negative reviews she received following the 2021 season could not have been due to A.D. Ackerman's own retaliatory motives. *See Leonard v. E. Illinois Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) ("For a suspicious-timing retaliation theory, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity."). In addition, as these reviews were solicited in the seasons before and after her protected activities, this undercuts any potential argument that the reviews themselves were solicited for retaliatory purposes.

into the players' anonymous reviews based upon the complaints contained in those reviews.

Nevertheless, even assuming Plaintiff had either adequately pleaded: (1) that A.D. Ackerman solicited false reviews from the players based upon his desire to retaliate against Plaintiff for her advocacy on behalf of female athletes, or (2) that A.D. Ackerman failed to provide relevant information to Liss; Plaintiff's cat's paw theory of liability still fails to establish causation as pleaded because Liss conducted her own independent investigation. "Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011). Here, as pleaded, Liss conducted a meaningful and independent investigation into the complaints against Plaintiff by contacting the players who left negative reviews. *See Brewer*, 479 F.3d at 918 ("By contrast, where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker."). Therefore, Liss's decision to terminate Plaintiff "did not rely on the credibility of a biased supervisor" and was instead based upon "independently sufficient reasons, such as corroboration of the allegations." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021). In fact, in criticizing Liss's investigation, the First Amended Complaint posits that "Liss only spoke with the players making the false accusations." (Doc. 13 at p. 12). In other words, Plaintiff concedes that Liss did not merely take the player's

anonymous reviews at face value and instead attempted to independently determine the credibility of their reviews.

In conclusion, nothing in the First Amended Complaint adequately and plausibly alleges that Liss terminated Plaintiff as a result of A.D. Ackerman's unlawful, retaliatory animus. To have sufficiently pleaded this element of her Title IX retaliation claims under a cat's paw theory, Plaintiff needed to adequately allege that Liss's investigation was not meaningful and independent, and explain why the negative reviews written by the players should be attributed to A.D. Ackerman. Therefore, as currently pleaded, the Court finds the First Amended Complaint fails to sufficiently establish the causation element of either Title IX claim using a cat's paw theory of liability premised upon A.D. Ackerman's allegedly unlawful, retaliatory animus.

Furthermore, to the extent Plaintiff has attempted to plead causation under more traditional means,[5] the Court finds that the First Amended Complaint fails in that regard because it does not plausibly allege a causal connection between Plaintiff's protected activities and Liss's allegedly retaliatory act of terminating Plaintiff. *Conviser v. DePaul*

---

[5] Based upon Plaintiff's response brief, it does not appear Plaintiff has attempted to plead facts that Liss had knowledge of Plaintiff's protected activities. For example, Plaintiff's response brief states, "Greenville argues Sheets did not adequately plead the decisionmaker knew about her advocacy because she did not allege Liss knew about her advocacy. ***However, Liss was not the decisionmaker***." (Doc. 24-1 at pp. 11 & 15-16). Thus, when it comes to establishing a causal connection between Plaintiff's protected activities and her termination, Plaintiff appears to have chosen to allege causation based upon a cat's paw theory of liability involving A.D. Ackerman, and not upon Liss's own, independent knowledge of Plaintiff's protected activities. However, as discussed above, the First Amended Complaint fails to sufficiently plead a cat's paw theory of liability because Plaintiff has not alleged that the player reviews central to the underlying investigation were in any way altered or coerced by A.D. Ackerman. Moreover, at one point in her response brief, Plaintiff also states, "when drawing reasonable inferences in Plaintiff's favor, [Plaintiff] advocated within Greenville's athletic department[.]" (*Id.* at p. 11). This further demonstrates that Plaintiff's allegations are that Liss (who was not within the athletic department), acted as a cat's paw for A.D. Ackerman and the athletic department.

*Univ.*, 649 F. Supp. 3d 686, 707 (N.D. Ill. 2023) ("At the pleadings stage, a Title IX retaliation plaintiff need not plead evidence, but rather must only plausibly allege a causal connection between protected activity and the retaliation.") (internal quotation marks and citations omitted). In fact, the First Amended Complaint does not even allege that Liss knew of Plaintiff's advocacy related to Greenville's allegedly discriminatory assistant coaching assignments or planned sports complex. Without any allegation that Liss knew of Plaintiff's protected activities, "[t]here is nothing in [Plaintiff's] complaint that would allow us to infer that [Liss] wanted to retaliate against [Plaintiff]" for her participation in those activities. *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019); *see also Pogorzelska v. VanderCook Coll. of Music*, 442 F. Supp. 3d 1054, 1065 (N.D. Ill. 2020) ("Plaintiff simply did not plead that VanderCook's conduct (including its inactions) was intentional or based on a retaliatory motive.").[6]

---

[6] Admittedly, in certain situations, "very close" timing (often referred to as "temporal proximity") may be sufficient to establish the causation element of a retaliation claim without any other evidence. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("[M]ere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]"). And here, Plaintiff does argue that the timing of her termination supports causation – albeit regarding A.D. Ackerman's involvement (*see* Doc. 24-1 at p. 14). Nevertheless, even if Plaintiff had plausibly alleged a close temporal proximity between her protected activities and termination, the Court finds this would be insufficient to establish causation as currently pleaded because Plaintiff has neither adequately alleged Liss's knowledge of her protected activities nor alleged sufficient facts under a cat's paw theory of liability. *See, e.g., Id.* (looking at the temporal proximity between an "employer's ***knowledge***" of protected activity and the adverse employment action); *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) ("Knowledge of the protected activity is necessary to show causation for a retaliation claim."); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) ("[T]here generally can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity."); *Rosas v. Bd. of Educ. of City of Chicago*, 652 F. Supp. 3d 951, 962 (N.D. Ill. 2023) (granting an individual's motion to dismiss and finding temporal proximity alone was insufficient to establish the plaintiff's Title VII retaliation claim against that individual because, without also alleging facts suggesting the individual knew of the plaintiff's activities, a claim of retaliation was not plausibly alleged); *Burks v. Bd. of Trustees of Florida Agric. & Mech. Univ.*, 505 F. Supp. 3d 1273, 1284 (N.D. Fla. 2020) ("As this Court previously noted, there must also be *knowledge* of the protected activity when arguing that temporal proximity is evidence of causation.).

For these reasons, Counts I and III of the First Amended Complaint are DISMISSED without prejudice. However, at this early stage in the proceedings, the dismissal of Counts I and III is without prejudice and Plaintiff is granted leave to file a Second Amended Complaint to attempt to address the deficiencies noted above.

### III. Elements of Plaintiff's Claim Under Title VII

"Under Title VII, an employer may not discriminate based on 'race, color, religion, sex, or national origin.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting 42 U.S.C. § 2000e–2(a)). To succeed on a Title VII discrimination claim, Plaintiff will need to prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).[7]

### IV. Analysis of Count II

Greenville argues that Count II of the First Amended Complaint must be dismissed because it fails to allege a causal connection between her sex and her termination (Doc. 23 at pp. 17-19). Specifically, Greenville emphasizes that Liss, the decisionmaker responsible for Plaintiff's termination, was also a female and based her investigation on reviews created by female athletes (*Id.*). In response, Plaintiff avers that

---

[7] Plaintiff's First Amended Complaint added a Title VII claim under Count II (Doc. 13 at pp. 17-18). Notably, while Title VII may be used to raise claims of both discrimination in the workplace and retaliation (related to one's employment), Plaintiff's First Amended Complaint appears to raise a Title VII discrimination claim based upon Plaintiff's sex, not based upon retaliation for Plaintiff's protected activities. *See, e.g.*, *Abrego v. Wilkie*, 907 F.3d 1004, 1012-15 (7th Cir. 2018) (separately considering Title VII discrimination claim and a Title VII retaliation claim and outlining the elements of both). For instance, Plaintiff's Title VII claim states that she "suffered at least the following adverse actions **because of her sex**[.]" (*Id.* at p. 17). Additionally, Count II of the First Amended Complaint does not discuss any protected activities taken by Plaintiff.

Liss was in A.D. Ackerman's cat's paw and that Plaintiff sufficiently alleged facts supporting the reasonable inference that A.D. Ackerman discriminated against Plaintiff for being a woman (Doc. 24-1 at pp. 16-18).

For the same reasons discussed at length above, the Court concludes that Plaintiff has not sufficiently pleaded facts supporting a cat's paw theory of liability under Count II. To reiterate, Plaintiff has not alleged that A.D. Ackerman coerced, edited, or in any way influenced the players to submit voluntary reviews and/or make false claims in those reviews. Likewise, Plaintiff has not plausibly alleged any facts supporting the reasonable inference that A.D. Ackerman biased or corrupted Liss's investigation. Thus, even if the Court assumes for argument's sake that A.D. Ackerman held an unlawful and discriminatory animus against Plaintiff due to her sex, the First Amended Complaint still fails to establish how A.D. Ackerman's discriminatory animus decisively influenced Liss's decision to terminate Plaintiff.

Consequently, the only issue left for the Court to determine is whether the First Amended Complaint adequately alleges causation based upon Liss's own discriminatory animus. Undoubtedly, members of a protected class can still discriminate against other members of their group. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). Here, however, the question is not whether it is theoretically possible that Liss discriminated against Plaintiff based upon her sex, but rather, whether Plaintiff adequately alleged facts to plausibly support such an inference. Having comprehensively reviewed the First Amended Complaint and Plaintiff's response brief, the Court concludes that Plaintiff has not done so.

At no point in the First Amended Complaint does Plaintiff allege any facts to support the inference that Liss held a discriminatory animus against females.[8] And while the First Amended Complaint does allege that Greenville did not hire or retain female coaches at the same rate as their male counterparts, the Court does not believe it reasonable to infer that Liss was responsible for this disparity since Liss was not even an employee of the athletic department (*see* Doc. 13 at p. 10). Similarly, even when viewed in a light most favorable to Plaintiff, the failure to provide equal assistant coaches and/or female-specific facilities at the planned sports complex does not create a reasonable inference of Liss's own discriminatory animus because there are no allegations that she was involved in those decisions.

Consequently, Count II of the First Amended Complaint is DISMISSED without prejudice. However, just as with Counts I and III, this dismissal is without prejudice and Plaintiff is granted leave to file a Second Amended Complaint that addresses the deficiencies identified above.

V.   **Plaintiff is Granted Leave to Amend**

Greenville's Motion to Dismiss is GRANTED as to all three counts raised in the First Amended Complaint. As noted, however, all three counts are dismissed without

---

[8] Here, as the Court understands both Plaintiff's First Amended Complaint and Response in Opposition, Plaintiff does not appear to be arguing that Liss took an adverse employment action against Plaintiff based upon her sex. Rather, Plaintiff appears to argue that Liss was duped or led into taking such an action at the behest of A.D. Ackerman, who was the one who really sought to discriminate against Plaintiff based upon her sex. Nonetheless, out of an abundance of caution and desire to be thorough, the Court has still analyzed whether the First Amended Complaint may have sufficiently pleaded Liss's own discriminatory animus.

prejudice. Thus, Plaintiff is GRANTED leave to file a Second Amended Complaint that addresses the deficiencies discussed above.

## CONCLUSION

Defendant Greenville University's Motion to Dismiss is **GRANTED** and Plaintiff Angela Sheets' First Amended Complaint is **DISMISSED without prejudice** (*see* Doc. 13). Plaintiff is **GRANTED** leave to file an amended complaint addressing the deficiencies discussed in this Order. Plaintiff shall have until **March 13, 2025,** to file a Second Amended Complaint. If Plaintiff declines or fails to amend her complaint by the deadline, this action will be dismissed with prejudice.

**IT IS SO ORDERED.**

**DATED: February 13, 2025**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**