## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ANGELA K. SHEETS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:23-cv-3754-MAB** |
| | ) | |
| **GREENVILLE UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Angela Sheets filed a Second Amended Complaint against Defendant Greenville University ("Greenville") for claims arising under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972 (Doc. 42). Presently before the Court is Greenville's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Rule 12(b)(6) (Doc. 43). For the reasons set forth below, Greenville's Motion to Dismiss is GRANTED in part and DENIED in part (Doc. 43).

## BACKGROUND

### I.    The Second Amended Complaint (Doc. 42)

Plaintiff Angela Sheets is a female softball coach who obtained her bachelor's degree from Greenville in 2012 (Doc. 42 at p. 2).[1] After graduating from Greenville, Plaintiff worked as the head softball coach at Peoria Christian Junior High School and obtained her master's degree from Bradley University (*Id.* at pp. 2-3). On or around May

---

[1] This matter is currently before the Court on a motion to dismiss and accordingly, the Court takes all well-pleaded factual allegations in Plaintiff's First Amended Complaint as true and draws all permissible inferences in Plaintiff's favor. *See, e.g., Dix v. Edelman Fin. Servs., LLC,* 978 F.3d 507, 512-13 (7th Cir. 2020).

2020, Plaintiff received a call from Greenville's Athletic Director, Tom Ackerman (hereinafter, "A.D. Ackerman") (*Id.* at p. 3). A.D. Ackerman informed Plaintiff that a softball coaching position was available at Greenville and asked her to apply (*Id.*). Plaintiff did and her final interview was conducted with A.D. Ackerman and Katrina Lopez Liss, Greenville's Chief Diversity and Culture Coordinator and Title IX Coordinator (*Id.*). Thereafter, Plaintiff was hired as Greenville's head softball coach in July 2020 (*Id.*).

Plaintiff's first season as Greenville's head softball coach occurred in 2021 (*Id.*). At that time, Plaintiff was provided with a graduate assistant named Becca Oldham to help her manage the team (*Id.* at p. 4). Oldham had recently played on Greenville's softball team prior to graduating and was friends with many of the players on the team (*Id.*). During the 2021 season, Oldham actively worked with her friends on the team to undermine Plaintiff (*Id.*). This included Oldham and her friends holding meetings with A.D. Ackerman and Hayle Gibson - Greenville's senior woman administrator and A.D. Ackerman's associate head woman's volleyball coach, wherein Oldham and her friends would make false claims about Plaintiff (*Id.*). Ultimately, the softball team went 9-15 in the 2021 season (*Id.*).

After the 2021 season concluded, Greenville sent out anonymous reviews for the softball team's players to evaluate Plaintiff (*Id.*). Those reviews served as the basis for Plaintiff's yearly review meeting with A.D. Ackerman, Gibson, and Stephen Groves - Greenville's Associate Athletic Director and Assistant Men's Basketball Coach (*Id.*). At that meeting, A.D. Ackerman told Plaintiff that Oldham's friends on the team made false

claims about Plaintiff in those reviews (*Id.* at pp. 4-5). However, Plaintiff was not provided with copies of those false reviews and they were not placed in her employee file (*Id.* at p. 5). A.D. Ackerman also indicated that several of the players who made false claims had struggled with their conduct in the past (*Id.*). However, A.D. Ackerman did not want to remove the problematic players and instead suggested Plaintiff draft team rules and expectations (*Id.*). Meanwhile, Plaintiff held a yearly review meeting with Oldham (*Id.*). At that meeting, Oldham told Plaintiff that she wanted to be Greenville's head softball coach and could do better than Plaintiff (*Id.*).

After the 2021 season, A.D. Ackerman required Plaintiff to attend weekly meetings with Sonya Jones, a professor at Greenville who had previously played softball at Greenville and had her office in the Athletic Department (*Id.* at pp. 5-6). Jones was close friends with Liss and would convey the contents of their weekly meetings to Liss (*Id.* at p. 6).

Additionally, Plaintiff followed A.D. Ackerman's advice and created team rules and expectations (*Id.*). The players complained about the rules to Jones and showed her the rules (*Id.*). However, during Plaintiff's weekly meeting with Jones, Jones told Plaintiff she did not see an issue with the rules Plaintiff developed (*Id.*). Subsequently, Liss informed Plaintiff that she and Jones are close friends, that she had knowledge of Plaintiff's meetings with Jones, and that she did not see an issue with the rules either (*Id.*). Ultimately, each player signed the new team rules (*Id.*).

Oldham left her assistant position following the 2021 season and Ivan Estevez, a close friend of A.D. Ackerman, was hired on as a part-time assistant (*Id.* at pp. 6-7).

Estevez was completing his master's degree during Plaintiff's first year of employment (*Id.* at p. 7). After being hired, A.D. Ackerman and Estevez held scheduled weekly meetings together, which was unusual because Estevez was the only assistant coach who had weekly meetings scheduled with A.D. Ackerman (*Id.*). Furthermore, Estevez continued to work a full-time job outside of his assistant coaching position (*Id.*). As a result, Estevez was often late to practice and/or unable to travel to away games, and Plaintiff was frequently left to coach the 23 to 19 player team on her own (*Id.*).

This prompted Plaintiff to beg A.D. Ackerman to increase her coaching staff by adding a full-time assistant coach (*Id.* at pp. 7-8). A.D. Ackerman informed Plaintiff that she could only have a full-time assistant coach if there were over 30 players on the team's roster (*Id.* at p. 8). Consequently, Plaintiff started a junior varsity program and was able to grow the softball team's roster to over 30 players for the 2023 season (*Id.*). However, A.D. Ackerman then backtracked and told Plaintiff that she could only look for a graduate assistant, who would offer minimal help (*Id.*). At Plaintiff's weekly meeting with Jones, Plaintiff told Jones that she was not receiving the assistant coaching support that other head coaches had received and expressed her frustration with A.D. Ackerman's backtracking (*Id.*). At that time, male head coaches at Greenville were each supported by one assistant coach or more (*Id.* at pp. 8-9).

During the 2022 season, the main issue the softball players raised with Plaintiff related to playing time (*Id.* at p. 9). Additionally, Plaintiff removed two players from the team during the 2022 season due to their failure to communicate with Plaintiff and Estevez (*Id.*). Liss attended softball games with A.D. Ackerman, Jones, and Suzanne

Davis, the President of Greenville (*Id.*). A.D. Ackerman and Liss are both close friends with Davis outside of work (*Id.* at pp. 9-10). Moreover, Davis's husband is also close friends with A.D. Ackerman (*Id.* at p. 9). In the end, the softball team finished the 2022 season with a record of 22-21 and made it to the conference championship game (*Id.*). Several team members were awarded additional regional honors and the team led the conference in various performance metrics (*Id.* at p. 10).

Meanwhile, Greenville's Athletic Department was in the process of planning a multimillion-dollar sports complex during the 2022 season (*Id.*). The planned complex did not have any female specific locker rooms or showers, even though several men's teams received their own spaces (*Id.*). Instead, after the football season had ended, the softball program would share the football locker room with the women's track team (*Id.*). Plaintiff consistently advocated for female athletes in opposition to the proposed plan (*Id.*). Furthermore, Liss was present on more than one occasion when Plaintiff voiced her opposition and asserted that the planned athletic complex had little, if any, benefit for women's sports (*Id.*). After Plaintiff complained about the athletic complex being devoted to men's sports, she was gradually excluded from all meetings about the complex (*Id.* at p. 11).

Following the 2022 season, Greenville sent out anonymous reviews for the softball players to use to evaluate Plaintiff (*Id.*). While the reviews were voluntary, Greenville strongly encouraged the softball players to complete them (*Id.*). However, prior to sending out the reviews, A.D. Ackerman secretly met with members of the softball team

(*Id.*). Similar to the prior season, softball players once again used the reviews to make false accusations about Plaintiff (*Id.*).

Those reviews then served as the basis for Plaintiff's yearly review meeting in May 2022 (*Id.*). At that meeting, A.D. Ackerman told Plaintiff that she wasn't "going to want to read" the reviews (*Id.*). He then said that the situation was out of his hands and indicated that Liss would handle the situation (*Id.*). However, upon examining the reviews, Plaintiff discovered that nine reviews were negative and contained false accusations, and nine reviews were positive (*Id.* at p. 12). This appeared to align with the fact that only 9 players can play at a time in softball (*Id.*). Furthermore, Plaintiff was deeply troubled by the false accusations in the negative reviews that alleged she was mentally and physically abusive (*Id.*).

Plaintiff did not receive a call from Liss, so she contacted the Human Resources Department (*Id.*). At that time, Plaintiff learned that Liss was performing an investigation into Plaintiff because the players' reviews had triggered a Title IX Investigation against her (*Id.*). A.D. Ackerman informed Plaintiff that she could have one or two confidants during the investigation and he told her that Estevez should be one of them (*Id.*). Consequently, Plaintiff confided in Estevez who reassured her that she did nothing wrong, the allegations were false, and the season went well (*Id.*). Estevez also encouraged Plaintiff to confide in Jones.

While the investigation was ongoing, Plaintiff received a call from Roy Mulholland, the head coach of the women's basketball team (*Id.*). Mulholland told Plaintiff that everything would work out for her if she apologized to Liss and A.D.

Ackerman (*Id.*). Additionally, at some point in time, Mulholland confided in Plaintiff that he had been subjected to some very negative reviews from his team's players and he did not suffer any adverse employment action (*Id.* at p. 19). Furthermore, Jones frequently called Plaintiff during the pendency of the investigation and then conveyed the contents of her conversations with Plaintiff to A.D. Ackerman and Liss (*Id.* at pp. 12-13). Jones told Plaintiff that she should not be worried about losing her job as a result of the investigation (*Id.* at p. 13).

Plaintiff spoke with Liss who similarly informed her that she should not be worried about losing her job as a result of the investigation (*Id.*). Liss also told Plaintiff that she could have witnesses and instructed Plaintiff to provide her with a witness list (*Id.*). On or around May 14, 2022, A.D. Ackerman spoke with Plaintiff and informed her that she should continue her usual duties as head softball coach (*Id.*). Two days later, Plaintiff informed Liss that she should contact Estevez and Shelby Cash, a softball alum who volunteered to help Plaintiff, to act as witnesses (*Id.*). Liss responded that she would interview the complaining players and then schedule a time to provide Plaintiff an opportunity to respond (*Id.*). Plaintiff subsequently created a list of six additional contacts who could attest to her character and her interactions with the players (*Id.*).

On May 26, 2022, Plaintiff asked A.D. Ackerman and Liss if they could have a meeting to discuss the upcoming season in light of the ongoing investigation (*Id.*). A meeting was held one day later with Plaintiff, A.D. Ackerman, and Liss (*Id.* at p. 14). At that meeting, Liss informed Plaintiff that she was terminated (*Id.*). Liss also remarked that

Plaintiff should not have told Estevez anything (*Id.*). However, Liss did not provide Plaintiff with any additional information regarding the investigation (*Id.*).

Just minutes after being terminated, Plaintiff received a phone call from Estevez (*Id.*). Estevez told Plaintiff that he never contacted anyone regarding the investigation (*Id.*). However, Estevez's statements demonstrated that he knew more about the players' complaints, meetings between A.D. Ackerman and Liss, and meetings between A.D. Ackerman and the players (*Id.*). Plaintiff's other witnesses said they had never been contacted during the investigation (*Id.*). Liss subsequently confirmed that she had only spoken with the players who made the false accusations against Plaintiff (*Id.* at p. 15).

Greenville's Title IX resources and policies were not followed during the investigation and Plaintiff was never provided with a written report of factual findings (*Id.* at pp. 15-16). When Plaintiff asked Liss why she was terminated, Liss merely told her that it was for a long list of reasons that Plaintiff would not agree with (*Id.* at p. 16). Liss did not elaborate on those reasons or provide any of them to Plaintiff (*Id.*). Multiple softball players who supposedly left negative reviews of Plaintiff later sent her text messages stating they liked her as a coach, would miss her, and did not understand what had happened (*Id.*). Relatedly, current and incoming family members of the team's players were upset about Plaintiff's termination and reached out to A.D. Ackerman (*Id.*).

Just prior to Plaintiff's termination, the only other female head coach at Greenville had also been terminated following an investigation (*Id.* at p. 17). That female head coach was also never provided an assistant coach (*Id.*). As such, Greenville did not have a single female head coach after Plaintiff's termination (*Id.* at p. 16).

Estevez replaced Plaintiff as the head softball coach (*Id.* at p. 17). Immediately thereafter, A.D. Ackerman provided Estevez with the support of two, full-time assistant coaches (*Id.*). However, it appears Estevez was proceeding with just one assistant coach at some point thereafter (*Id.* at p. 18). Similarly, Greenville's other male head coaches were all supported by one or more assistant coach (*Id.* at pp. 17-18). In contrast, Emily Butler, Greenville's head coach for men's volleyball does not have an assistant coach and Greenville's only other female head coach is only provided one assistant (*Id.* at p. 18). Moreover, while numerous male head coaches have been working at Greenville for extended periods of time, only one female coach has been employed by Greenville for more than 5 years and she has close ties to A.D. Ackerman and was promoted to be A.D. Ackerman's Associate Athletic Director in 2021 (*Id.* at pp. 18-19). Beyond that, Greenville has been selectively concerned about coaches' reviews (*Id.* at p. 19). For instance, A.D. Ackerman has an online coach rating of 1.8/5 with his lowest rating in the area of honesty (*Id.*).

## II.     *Procedural History*

Plaintiff filed her original Complaint with the Court on November 21, 2023 (Doc. 1). Thereafter, Plaintiff received a right to sue letter from the United States Equal Employment Opportunity Commission in February 2024 (Doc. 13-1). As a result, Plaintiff filed a First Amended Complaint on March 21, 2024 (Doc. 13). Greenville filed a Motion to Dismiss the First Amended Complaint (Doc. 22), which the Court granted in February 2025 (Doc. 38). Specifically, the Court found that Plaintiff's retaliation claims and discrimination claim each failed to adequately plead causation (*see generally Id.*).

However, the Court dismissed Plaintiff's claims without prejudice, such that Plaintiff was granted leave to file a Second Amended Complaint (*Id.* at pp. 16-17).

Plaintiff filed the operative Second Amended Complaint on April 14, 2025 (Doc. 42). The Second Amended Complaint raises three claims, including: (Count I) a claim of retaliation for opposing Greenville's discriminatory assistant coaching policy under Title IX, 20 U.S.C. § 1681, *et seq.*; (Count II) a claim that Greenville terminated her employment because of her sex, in violation of Title VII, 42 U.S.C. § 2000e, *et. seq.*; and (Count III) a claim of retaliation for opposing Greenville's discriminatory sports complex in violation of Title IX (*see Id.* at pp. 20-25).

In response, Greenville filed the instant Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 43). Thereafter, Plaintiff filed a Response in Opposition to Greenville's motion (Doc. 45), and Greenville filed a Reply in Support (Doc. 46). Furthermore, after filing its Reply, Greenville also filed a Notice of Supplement Authority (Doc. 47), which Plaintiff responded to (Doc. 48).

## LEGAL STANDARD FOR MOTIONS TO DISMISS

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). In order to state a claim upon which relief can be granted, the plaintiff's pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is

plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta*, 761 F.3d at 736 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff's pleading must state a claim that is facially plausible, meaning that "the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the plaintiff does not need to provide "detailed factual allegations," the plaintiff must plead more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

In deciding whether the complaint sufficiently states a claim, the court takes well-pleaded allegations in the complaint as true and draw all permissible inferences in favor of the plaintiff. *See, e.g.*, *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 512-13 (7th Cir. 2020). Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

## DISCUSSION

### I.    Plaintiff's Title IX Retaliation Claims

#### a.    Preemption

Greenville argues that Counts I and III should be dismissed because, among other reasons, they are preempted by Plaintiff's employment-discrimination claim raised in Count II (Doc. 43 at pp. 8-12). More specifically, Greenville contends that Plaintiff's retaliation claims in Counts I and III allege retaliation for actions she took in relation to discrimination in her employment, not for actions she took in relation to discrimination

against her student athletes (*Id.*). In response, Plaintiff avers that her Title IX claims are appropriate because in both circumstances, she was complaining about the university's discrimination against her students (Doc. 45-1 at pp. 10-12). Here, the Court separately addresses the preemption arguments for Counts I and III because there are critical distinctions between the actions pleaded for those two retaliation claims.

While the Court acknowledges that this is a fluid area of law,[2] current Seventh Circuit precedent provides, "[w]hen Congress creates a comprehensive statutory scheme for protecting a right, it may impliedly express the intention that this scheme should be exclusive." *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 861 (7th Cir. 1996) *abrogated by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009). Therefore, employment discrimination claims under Title VII are found to preempt Title IX retaliation claims when the Title IX claims "sound squarely in employment discrimination" and the plaintiff "does not identify any remedy she seeks under Title IX that would be unavailable under Title VII." *Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833,

---

[2] Greenville argues that the standard found in *Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833, 840 (N.D. Ill. 2021), which was mentioned in the Court's prior Order (*see* Doc. 38 at p. 8, fn. 2) is incorrect because it is narrower than the broad preemption principles cited in some other cases, including a recent Eleventh Circuit case (Doc. 43 at pp. 10-11) (citing *Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 869 (11th Cir. 2024)). Meanwhile, Plaintiff cited *Agbefe* and argued for the applicability of the standard discussed therein (*see* Doc. 45-1 at pp. 10-11). Ultimately, the Court has reviewed the current caselaw at length and believes the standards discussed herein represent the applicable law in the Seventh Circuit under the current facts. In any event, the Court does not believe that an Eleventh Circuit opinion "mandates dismissal" of this action filed in the Seventh Circuit (*see* Doc. 43 at p. 10). *Waid's* holding was not as broadly applicable as the finding in *Joseph*, and Greenville has not provided an on-point Seventh Circuit case that would mandate such a conclusion under the facts presented here. *Compare Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 861 (7th Cir. 1996), *with Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 864 (11th Cir. 2024).

Conversely, to the extent other cases or circuits may apply narrower standards than those stated in *Agbefe* or find preclusion entirely inapplicable, Plaintiff has not pointed to any precedential cases holding so. Rather, the Court finds Plaintiff has waived such contentions by arguing for the application of the standard found in *Agbefe* (*see* Doc. 45-1 at pp. 10-12).

840 (N.D. Ill. 2021). *See also Brown v. Illinois Dep't of Human Services*, 717 Fed. Appx. 623, 625–26 (7th Cir. 2018) (Stating that, in order to prevail, the plaintiff "must also persuade us to overturn our precedent that all employment-discrimination claims must be brought under Title VII."). Therefore, in *Agbefe*, the district court held:

> Here, the theory behind Agbefe's Title IX retaliation claim is that the Board subjected her to retaliation for opposing sex-based discrimination against *herself*, not against her students. *See* Doc. 1 at ¶ 58 (describing Agbefe's protected activity as "opposing the sex discrimination and harassment *to which she was subjected*") (emphasis added). In other words, the alleged retaliation against Agbefe was due to her opposition to a discriminatory employment practice; such a claim, unlike the ones in *Cieslik, Burton,* and *Jackson*, is exactly what Title VII allows. And thus, under the preclusion principle set forth in *Waid*, Agbefe may not bring that claim under Title IX.

538 F. Supp. 3d at 841.

Conversely, as *Agbefe* acknowledged, other district courts have reached a different conclusion where "the Plaintiffs alleged their opposition to sexual harassment in an educational setting, not in the context of an employer-employee relationship." *Cieslik v. Bd. of Eduction of City of Chicago*, 1:19-CV-05553, 2021 WL 1172575, at *5 (N.D. Ill. Mar. 29, 2021). For instance, in *Cieslik*, the district court found that the plaintiffs' Title IX retaliation claim was not precluded by Title VII because the claim was not premised on opposition to employment discrimination and was instead "premised on opposition to student versus teach harassment." *Id.* at *6. Put another way, Seventh Circuit precedent, as well as district court decisions interpreting that precedent such as *Agbefe* and *Cieslik*

distinguish between instances where discrimination[3] is centered upon employment and instances where discrimination is centered upon education. *See, e.g.*, *Agbefe*, 538 F. Supp. 3d at 840.

Here, as applied to Count I, the Court finds Greenville's preemption argument to be persuasive. Crucially, in Count I, Plaintiff alleges that she was retaliated against for opposing Greenville's discriminatory assignment of assistant coaches on the basis of the head coaches' sex and advocating for additional assistant coaches for herself (Doc. 42 at p. 21). Notably absent from Plaintiff's pleadings, however, is any allegation that Plaintiff opposed Greenville's allegedly discriminatory assistant coaching policy because it discriminated against her female student athletes (*see generally* Doc. 42). Instead, the Second Amended Complaint repeatedly claims that Plaintiff was retaliated against for opposing Greenville's discriminatory assistant coaching policy "on the basis of *the head coach's sex* and advocating for additional assistant coaches *for herself*." (Doc. 42 at p. 21) (emphasis added). As explained in *Agbefe*, this distinction is crucial because the alleged retaliation was due to her opposition to a discriminatory employment practice, not discrimination against her female student athletes. *See Agbefe*, 538 F. Supp. 3d at 841.

In fact, Plaintiff's Response even acknowledges this clear distinction, stating "[i]f the employee alleges retaliation for opposing discrimination against her students, Title VII does not preclude Title IX, as it constitutes alleged discrimination in education." (Doc.

---

[3] "[R]etaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

45-1 at p. 10) (citing *Agbefe*, 538 F. Supp. 3d at 840). Yet, at no point does Plaintiff point to anywhere in the Second Amended Complaint where she alleges that her opposition to Greenville's assistant coaching policy was due to discrimination against her female student athletes.[4] Therefore, because the Second Amended Complaint definitively establishes that Plaintiff's claim in Count I was brought based upon employment-discrimination she was experiencing (i.e., her coaching and the refusal to provide her a full time assistant coach), this claim is preempted by Plaintiff's Title VII employment discrimination claim raised in Count II.

In stark contrast, however, the Court finds that Plaintiff's Title IX retaliation claim raised in Count III is not preempted because that claim involves actions Plaintiff took challenging sex-based discrimination suffered by her female student athletes. Namely, Count III alleges that Plaintiff was retaliated against for "opposing Greenville's plan for a sports complex that did not provide comparable facilities for each sex." (Doc. 42 at p. 24). Additionally, the Second Amended Complaint alleged that Plaintiff constantly advocated "for the female sports" and objected to the complex, in the presence of Liss, because the new complex had "little, if any, benefit for women's sports." (*Id.* at p. 10). In other words, unlike Plaintiff's pleadings in Count I which were related to her own

---

[4] Furthermore, while Plaintiff's Response argues that Plaintiff sought a full-time coach to both help her *and* "to provide adequate support for her student-athletes" (Doc. 45-1 at p. 12), no similar allegation is found in the Second Amended Complaint (*see generally* Doc. 38). Quite simply, Plaintiff's failure to raise such a critical allegation cannot be cured by doing so in her Response.

Additionally, Plaintiff's Second Amended Complaint undercuts this argument by including factual allegations that Greenville's discriminatory assistant coaching assignment was based on the head coach's sex and not the players' sex (*see* Doc. 42 at p. 18) (alleging that the female head coach of the *men's* volleyball team was the only head coach who was not provided an assistant).

employment, Count III's allegations make it clear that her complaints were challenging sex-based discrimination against her female student athletes. Therefore, this retaliation claim is not preempted by Plaintiff's Title VII claim because it does not allege retaliation for opposing a discriminatory employment practice. *See Cieslik*, 2021 WL 1172575 at *5 ("In this particular case, this argument fails because the Plaintiffs alleged their opposition to sexual harassment in an educational setting, not in the context of an employer-employee relationship.").

In summation, the Court finds Plaintiff's Title IX retaliation claim in Count I is preempted by Plaintiff's Title VII discrimination claim in Count II. Accordingly, Greenville's Motion to Dismiss is GRANTED as to Count I and that claim is DISMISSED with prejudice. Conversely, the Court finds Plaintiff's Title IX retaliation claim in Count III is not preempted by her Title VII discrimination claim in Count II. Therefore, the sufficiency of Plaintiff's pleadings as to Count III will be analyzed further below.

### b. Elements of Plaintiff's Title IX Retaliation Claim

"Both Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 permit plaintiffs to bring causes of action for retaliation." *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing 42 U.S.C. § 2000e-3(a) (Title VII), and *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (Title IX)). Under Title IX, an individual may bring a retaliation claim if he or she is retaliated against for opposing discrimination against others. *Jackson*, 544 U.S. at 179-180. Specifically, to prevail on a Title IX retaliation claim, Plaintiff will need to show that: (1) she engaged in protected activity under Title IX, (2) Greenville took a materially adverse

action against her; and (3) there was a but-for causal connection between the two. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019); *Burton*, 851 F.3d at 695.

Establishing causation under Title IX requires pleading that the decisionmaker's adverse action was taken in retaliation for Plaintiff's protected activities. *See Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 596 (N.D. Ill. 2021) ("A primary consideration for causation at the motion to dismiss stage is whether the plaintiffs allege some "retaliatory motive" connecting the protected activity and adverse action."). Consequently, under Title IX, "[k]nowledge of the protected activity is necessary to show causation for a retaliation claim." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022). This is because "[a] supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place." *Id.* at 915-16.[5]

### c. Analysis of Plaintiff's Retaliation Claim in Count III

Having found that Plaintiff's Title IX retaliation claim in Count III is not preempted, the Court considers whether Count III adequately pleads the elements of a Title IX retaliation claim. Greenville contends that the Second Amended Complaint does not do so because it fails to adequately plead a protected activity and a causal connection

---

[5] However, one exception to the requirement that a decisionmaker have knowledge of the protected activities is known as a "cat's paw" theory of liability. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021). "This theory is invoked in employment discrimination contexts when a biased supervisor, or a biased subordinate, 'who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Id.* at 574 (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). To prevail under a cat's paw theory of liability, the plaintiff has to show that the ultimate decisionmaker's decision was "decisively influenced by someone who *was* prejudiced." *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 865 (7th Cir. 2016). *See also Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011).

between that activity and her termination (Doc. 43 at pp. 12-17). Conversely, Plaintiff argues that the Second Amended Complaint adequately pleads both of those elements and nothing further is required at the pleading stage (Doc. 45-1 at pp. 12-15).

First, there is no dispute that Plaintiff's termination constitutes a materially adverse action taken against Plaintiff. *See, e.g., Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 596 (N.D. Ill. 2021) ("[A] change to the terms and conditions of 'employment' status constitutes a materially adverse action under Title IX."). The Complaint adequately pleads that such an action was taken against Plaintiff and therefore this element has been satisfied. *See Id.*

Second, taking all well-pleaded allegations in the Second Amended Complaint as true and drawing all permissible inferences in favor of Plaintiff, the Court finds that Plaintiff has adequately pleaded a protected activity in Count III. Namely, Plaintiff adequately alleges that she vocally opposed the athletic complex during the 2022 season because the planned facility was devoted to men's sports and had little, if any, benefit for women's sports (*see* Doc. 42 at p. 10). Moreover, the Second Amended Complaint alleges that due to Plaintiff's gender-based opposition, she was excluded from all meetings about the complex (*Id.* at p. 11). Accordingly, these allegations support the reasonable inference that her vocal opposition to the complex because of its lack of women specific facilities occurred at those meetings. Significantly, "speaking out against sex discrimination is a recognized protected activity under Title IX." *Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 595 (N.D. Ill. 2021). *See also O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (To demonstrate that the plaintiff engaged in a protected activity, "he must show

that he took some step in opposition to a form of discrimination that the statute prohibits."). As such, Plaintiff has adequately pleaded that she engaged in a statutorily protected activity.

Third, the Court finds Plaintiff has adequately pleaded a but-for causal connection between her protected activity and the materially adverse action taken against her. *See Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 950 (N.D. Ill. 2017), *aff'd,* 933 F.3d 849 (7th Cir. 2019) ("Thus, to survive a motion to dismiss, Doe 'must provide some allegations to allow the Court to infer a causal connection between his treatment and gender bias and raise the possibility of relief under Title IX above the speculative level.'"). Notably, in the Court's Order ruling upon Greenville's prior Motion to Dismiss, the Court found that the First Amended Complaint failed to adequately plead this element because Plaintiff alleged Liss was an independent decision maker who was responsible for her termination and she failed to allege that Liss knew of Plaintiff's protected activity and either personally held an unlawful animus or was decisively influenced by someone else who did such as A.D. Ackerman (*see* Doc. 38 at pp. 8-9). In contrast, Plaintiff's Second Amended Complaint cures these deficiencies by alleging that: (1) Liss had knowledge of Plaintiff's protected activity because she was present on more than one occasion when it occurred and also was in frequent contact with others who were aware of Plaintiff's vocal opposition; (2) Liss was not independently investigating Plaintiff and therefore, the termination decision was not solely attributable to Liss; and (3) Liss, A.D. Ackerman, and Greenville retaliated against Plaintiff because of her gender-based opposition to the

facility that they sought to see constructed as planned (*see* Doc. 42 at pp. 21-23).[6] *See Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 960 (N.D. Ill. 2017) ("A Title IX claim fails if the plaintiff has not alleged some 'retaliatory motive' connecting the protected activity to the adverse action.").

In addition to the above allegations supporting an inference of causation, the Second Amended Complaint contains additional circumstantial allegations supporting an inference of causation. *See Conviser*, 532 F. Supp. 3d at 596 (discussing circumstantial evidence of retaliation including suspicious timing, comparators, and evidence of pretext). For example, Plaintiff has alleged that Liss's investigation and her termination occurred in May 2022, which the Court reasonably infers was within months or weeks of her protected activity that occurred during the 2022 season (*see* Doc. 42 at 10). *See Bryant v. Gardner*, 587 F. Supp. 2d 951, 964-65 (N.D. Ill. 2008) ("A causal link may be shown where an adverse employment action occurred 'closely on the heels' of protected activity."). Thus, while this temporal proximity would likely be insufficient to establish causation on its own, it does provide some additional support for the reasonable inference of a causal connection between her protected activity (i.e., opposing the facility for gender-based reasons) and her termination. In addition, Plaintiff has also alleged that: (1) she was excluded from meetings about the planned complex because of her opposition (Doc. 42 at p. 11); (2) she was not provided with a fair process during the investigation because it

---

[6] Moreover, the Second Amended Complaint alleges that Liss was personally involved in the athletic complex's planning and opening (Doc. 42 at pp. 10-11) and was supportive of A.D. Ackerman's plans for the Athletic Department (*Id.* at p. 11).

was pretextual (*Id.* at pp. 12-14); (3) she was replaced by a less qualified male coach (*Id.* at p. 17); and (4) the reasons provided for her investigation and termination were not similarly applied to a male coach (*Id.* at p. 19).[7] Consequently, these allegations provide further support to reasonably infer a causal connection.

Therefore, Plaintiff has adequately pleaded the existence of a but-for causal connection between her protected activities and her termination. Accordingly, Plaintiff has sufficiently pleaded each element of her Title IX retaliation claim found in Count III. Greenville's Motion to Dismiss Count III is DENIED.

## II.    Plaintiff's Title VII Discrimination Claim

### a.    Elements of Plaintiff's Claim Under Title VII

"Under Title VII, an employer may not discriminate based on 'race, color, religion, sex, or national origin.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting 42 U.S.C. § 2000e–2(a)). In the context of a Title VII claim, a complaint must clear two easy hurdles. *See E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). "First, the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* In fact, the Seventh Circuit

---

[7] Additional allegations that may support a but-for causal connection are contained within Plaintiff's Second Amended Complaint (*see generally* Doc. 42). However, the Court need not discuss those additional examples at this time because the examples discussed above are more than adequate at this stage of proceedings.

"previously ha[s] stated, on numerous occasions, that a plaintiff alleging employment discrimination under Title VII may allege these claims quite generally." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "A complaint need not 'allege all, or *any*, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Id.* (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)).

Furthermore, at the pleading stage, the Court does not need to analyze any non-discriminatory motives for the employer's adverse action unless the complaint alleges "facts that establish an 'impenetrable defense' to her sex discrimination claim." *Id.* at 1086. Most details are more efficiently learned through the discovery process and a plaintiff need not plead facts that are not obviously important at the pleading stage. *See E.E.O.C.*, 496 F.3d at 779. "[A] plaintiff might sometimes have a right to relief without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim." *Id.* at 780.

### b. Analysis of Plaintiff's Discrimination Claim in Count II

Greenville argues that Count II of the Second Amended Complaint must be dismissed because Plaintiff failed to adequately allege that the decisionmaker who terminated her employment did so because of her sex (Doc. 43 at p. 17). In response, Plaintiff contends that she made a prima facie showing of sex discrimination because she provided sufficient allegations of a similarly situated male employee who was treated more favorably, and she included sufficient allegations that she was replaced by someone outside of the protected class (Doc. 45-1 at pp. 16-17). Furthermore, Plaintiff contends that

Greenville's attempts to rebut her pleadings are improper at the pleading stage (*Id.* at p. 17).

The Court finds Plaintiff's second argument to be persuasive. Again, this case is before the Court on a motion to dismiss. As such, Plaintiff's Complaint only needed to describe her Title VII claim in sufficient detail to provide Greenville with fair notice and plausibly suggest that Plaintiff has a right to relief that raises that possibility above a speculative level. *See Tamayo*, 526 F.3d 1074 at 1084. Plaintiff's Second Amended Complaint does both of these things and the Court declines to preemptively analyze the additional arguments raised by the parties that are more appropriately raised at summary judgment, after discovery is complete. *See, e.g.*, *Vega v. Chicago Park Dist.*, 958 F. Supp. 2d 943, 953 (N.D. Ill. 2013) ("[The defendant] has spent a better part of its Motion to Dismiss and Reply on this count arguing that [the plaintiff] has failed to make a 'similarly situated' argument (*i.e.*, that similarly situated employees were treated more favorably than [the plaintiff]). However, the 'similarly situated' argument is an evidentiary standard applicable at the summary judgment stage; it is not a requirement in reviewing the sufficiency of a complaint.").

Here, Plaintiff's Second Amended Complaint contains sufficient detail to give Greenville fair notice of her claim and the grounds it rests upon. *See E.E.O.C.*, 496 F.3d at 776. Plaintiff pleads that she was terminated from her employment at Greenville because of her sex. *See Davis v. Metro. Pier & Exposition Auth.*, 11 C 9018, 2012 WL 2576356, at *7 (N.D. Ill. July 3, 2012) ("[I]n order to avoid dismissal under Rule 12(b)(6), a plaintiff alleging race or sex discrimination needs only to aver that her employer instituted a

specific adverse employment action against her on the basis of race and sex."). Plaintiff alleges that she was a female coach who was performing her job satisfactorily, yet she was terminated on the basis of her sex and replaced by a less qualified male coach (Doc. 42 at p. 22). *See Id.* In fact, the allegations related to Plaintiff's now-dismissed claim in Count I provide additional factual support because they allege that Plaintiff was not provided assistant coaching support on the same basis as male head coaches due to her sex (*see Id.* at p. 21).

Moreover, Plaintiff's Second Amended Complaint plausibly suggests that her Title VII claim has a right to relief. *See E.E.O.C.*, 496 F.3d at 776. Again, she provides sufficient, plausible allegations supporting her claim that she was terminated on the basis of her sex. And significantly, unlike in Plaintiff's First Amended Complaint, the Second Amended Complaint does not plead itself out of Court by including allegations that necessarily thwart her claim of discrimination (*see generally* Doc. 38). To be specific, Plaintiff's First Amended Complaint failed in this regard because it pleaded that she was terminated by Liss, an independent decision maker who was not part of the Athletic Department, and that Complaint neither alleged that Liss personally held an unlawful animus against Plaintiff nor claimed that Liss was duped into terminating Plaintiff by an individual who held an unlawful animus such as A.D. Ackerman (*see Id.* at pp. 15-16). Here, in contrast, Plaintiff's Second Amended Complaint adequately alleges: (1) that Liss was not independently investigating Plaintiff and was instead frequently in contact with members of the Athletic Department and working in conjunction with A.D. Ackerman and others to discriminate against Plaintiff based upon her sex; and (2) that Plaintiff was

terminated by Greenville based upon its unlawful animus towards Plaintiff's sex (*see* Doc. 42 at pp. 21-23).[8] Thus, the new allegations in Plaintiff's Second Amended Complaint do not succumb to the same shortcomings as her prior Complaint and are sufficient to plausibly suggest that she has a right to relief.

For all these reasons, Greenville's Motion to Dismiss Count II of Plaintiff's Second Amended Complaint is DENIED.

<u>CONCLUSION</u>

Defendant Greenville University's Motion to Dismiss is **GRANTED** in part and **DENIED** in part (Doc. 43). Specifically, Greenville's Motion to Dismiss is GRANTED as to Count I and that claim is DISMISSED with prejudice. Conversely, Greenville's Motion to Dismiss is DENIED as to Counts II and III and this action will proceed on those claims. Greenville shall file its Answer to the Second Amended Complaint on or before March 20, 2026.

**IT IS SO ORDERED.**

**DATED: March 6, 2026**

　　　　　　　　　　　　　　　　　**s/ Mark A. Beatty**　　　　　　　　
　　　　　　　　　　　　　　　　　**MARK A. BEATTY**
　　　　　　　　　　　　　　　　　**United States Magistrate Judge**

---

[8] The parties also dispute whether the Second Amended Complaint sufficiently pleaded each element of a Title VII sex discrimination claim (*see* Docs. 43, 45-1, 46). They then devote significant time to discussing other potential, nondiscriminatory motives for Greenville's actions and whether Plaintiff needed to rebut those nondiscriminatory reasons (*see Id.*). Put simply, these arguments are not appropriately raised at the pleading stage for a Title VII claim. Instead, they are more appropriately raised at summary judgment after the parties have conducted discovery. *See, e.g.*, *Vega*, 958 F. Supp. 2d at 953 ("However, the 'similarly situated' argument is an evidentiary standard applicable at the summary judgment stage; it is not a requirement in reviewing the sufficiency of a complaint.").